# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

DIANA GUZMAN,

        Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:21-cv-00564-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.      INTRODUCTION

Plaintiff Diana Guzman ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 11.)

1

## II.     BACKGROUND

Plaintiff protectively filed an application for SSI payments on April 17, 2018, alleging she became disabled beginning on August 1, 2016, due to a herniated disc, migraines, neck stiffness, numbness in the arms, elbows, hands, and finger, "possible arthritis," "possible fibromyalgia," anxiety, back pain that radiated down the right leg, "all of [her] bending areas hurt," depression, and an inability to concentrate.  (Administrative Record ("AR") 15, 65–66, 69, 202–03, 208, 237.)  She had previously filed an application for Disability Insurance Benefits on August 24, 2016, which was denied on December 12, 2016.  (AR 66.)  Plaintiff was born on March 13, 1964, and she was 54 years old on the date the application was filed.  (AR 65, 202, 208.)  She has at least a middle school education and has past work experience as a retail clerk and a caretaker.  (AR 37, 238–39.)

### A.     Relevant Evidence of Record[3]

#### 1.     Medical Evidence

Plaintiff has a history of back pain.  (AR 364–65, 368.)  An MRI of the thoracic spine in May 2018 ordered by primary care provider Dr. Nagy Awadalla, M.D., revealed mild degenerative changes and small posterior bulging discs, but no significant thoracic canal or thoracic foraminal stenosis.  (AR 368.)  A physical examination completed that same month by Dr. Awadalla showed tenderness as to Plaintiff's lumbar spine and moderate pain with motion.  (AR 375.)

At an office visit with Dr. Awadalla in June 2018, Plaintiff reported numbness in the right fingertips for three years and described her level of pain as an eight out of ten.  (AR 381–82.)  Dr. Awadalla determined, however, that Plaintiff's functional and cognitive status had not changed.  (AR 382.)  Later in June 2018, Plaintiff established care with a new primary care provider, Dr. William Bichai, M.D., at St. Mary Nephrology Medical Center.  (AR 576.)  Plaintiff complained of tingling in both hands and elbow pain, indicated she had been dropping things, and sought a referral to a rheumatologist.  (*Id.*)  Dr. Bichai noted Plaintiff's past history of anxiety and depression, but also that Plaintiff's mood was stable and that he would refill her prescription for Klonopin.  (AR 576–77.)

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

1    In August 2018, Plaintiff presented at an urgent care facility complaining of joint pain.  (AR

2 443, 445.)   A physical examination by Nurse Practitioner Brendon Helston of the left upper

3 extremity showed normal alignment and strength throughout, as well as no edema and an intact

4 range of motion, but tenderness of the back side of the left shoulder.  (AR 444.)  Nurse Practitioner

5 Helston determined Plaintiff had normal gait and posture, no musculoskeletal head or neck

6 abnormality on inspection or palpitation, and normal left lower extremity strength bilaterally.  (*Id*.)

7 Nurse Practitioner Helston noted a diagnosis of "[s]train of unspecified muscle, fascia and tendon

8 at shoulder and upper arm level, left arm."  (AR 444.)  Plaintiff was provided with a Toradol

9 injection and was discharged with instructions to use muscle relaxants only as needed, to rest the

10 injured area, and to return if there was no improvement after seven days.  (AR 444–45.)

11    In September 2018, Plaintiff underwent a neurosurgical consultation with Dr. Olusegun

12 Leramo, M.D., by referral from Dr. Bichai.  (AR 469.)  Plaintiff complained of constant neck pain

13 radiating to both shoulders and arms with numbness, tingling, and weakness, with the pain on the

14 right side being greater than the left.  (*Id*.)  Plaintiff indicated her symptoms had been present since

15 1997 and had progressively worsened over the years, and that physical therapy and pain

16 management were tried and failed.  (*Id*.)  A physical examination revealed weakness of the intrinsic

17 4/5 right and left arms and a slight limitation of the cervical spine with movements, but normal

18 gait.  (*Id*.)  Dr. Leramo found that Plaintiff experienced chronic post traumatic neck pain, bulging

19 C4-C5 and C5-C6 discs, right C6 and C7 radiculopathies, and probable mechanical discogenic neck

20 pain.  (*Id*.)  Dr. Leramo's recommendations included a neurology consultation with Dr. Kaveh

21 Saremi, M.D., clinical neurophysiologist, a repeat MRI of the cervical spine, and continued pain

22 management. (*Id*.)   The repeat MRI ordered by Dr. Leramo showed mild degenerative changes.

23 (AR 506.)

24    That same month, Plaintiff underwent a rheumatology consultation with Dr. Quynh Huynh,

25 M.D., by referral from Dr. Awadalla.  (AR 452.)  She complained of pain in her neck, across her

26 shoulder blades, hands, elbows, knees, and toes, as well as morning stiffness that lasted

27 approximately one hour and difficulty getting out of bed.  (*Id*.)  Plaintiff indicated her pain level

28 was at a ten out of ten, and the pain was relieved by hydrocodone and the Toradol injection received

at urgent care. (*Id*.) Plaintiff stated her pain was worse with cold weather and prolonged sitting and standing. (*Id*.) A physical examination showed normal range of motion and no tenderness to palpitation as to the neck, shoulders, elbows, wrists, knees, and ankles. (AR 453–54.) Dr. Huynh noted the possibility of an autoimmune disorder, including Sjogren's syndrome, left adrenal nodule, degenerative disc disease, thyroid nodules, and left cervical lymph node. (AR 455.)

Dr. Saremi saw Plaintiff in November 2018 and made the following findings: normal bilateral median and ulnar motor studies; normal bilateral median, ulnar, and radial sensory studies; mildly enlarged motor unit potential amplitudes with reduced recruitment in the right biceps muscle; and normal paraspinal muscles. (AR 470.) Dr. Saremi concluded that the study was "abnormal" and the electrophysiologic findings were consistent with mild and chronic right C6 radiculopathy. (*Id*.)

Dr. Saremi saw Plaintiff again in November 2018, when she complained of neck pain and some numbness int the left arm. (AR 506.) Plaintiff's neurologic examination, however, showed normal tone and bulk with symmetrical and full strength, no cerebellar ataxia, normal sensation as to all modalities, and normal gait and steady walking. (AR 507.) Dr. Saremi noted mild cervical degenerative disc disease and right C6 radiculopathy, but determined that there was no ongoing neurological condition and discharged Plaintiff from the neurology clinic. (*Id*.)

In April 2019, Plaintiff was diagnosed with Sjogren's syndrome with dry eyes at an ophthalmology consultation. (AR 510, 512.) A repeat MRI of the lumbar spine in June 2019 showed the following: 1 mm anterolisthesis of L5 over S1 vertebra without evidence of obvious lysis; mild degenerative change in the lumbar spine with paraspinal muscle spasm; and at L5-S1, spondylolisthesis and 1.5 mm broad-based right foraminal disc protrusion with bilateral facet joint hypertrophy results in mild neural foraminal stenosis. (AR 514.)

In August 2019, Plaintiff presented for a follow-up rheumatology appointment and reported continued joint and muscular pain. (AR 521.) She described feeling pain "all over the body" at a nine out of ten, "nonradiating," and stated that when she slept, she was awakened by pain, and even the use of a pillow or her clothes touching her resulted in pain. (*Id*.) A physical examination, however, indicated normal range of motion and no tenderness to palpitation as to Plaintiff's neck,

4

shoulders, elbows, and wrists, as well as 5/5 motor strength and intact sensation.  (AR 523–24.)
Plaintiff received another dose of Toradol, and the treatment plan included ruling out fibromyalgia
and following up with pain management.  (AR 527.)

By December 2019, Plaintiff was seen at urgent care again describing aching, shooting, and
cramping pain in the right lower extremity.  (AR 537.)  She stated the pain was made worse by
movement and rest, and was unchanged by the application of cold or heat as well as medication.
(*Id*.)  A physical examination conducted by Nurse Practitioner Helston showed normal gait and
posture, normal range of motion, strength, and sensation as to the right hip and knee, and no
abnormalities detected in the right knee, leg, ankle, or foot.  (AR 538–39.)

Multiple physical examinations conducted by Dr. Bichai from June 2018 to February 2019
showed spinal tenderness but good range of motion as to Plaintiff's back.  (AR 563, 566, 569, 572,
574, 577.)  From March 2019 to November 2019, with the exception of one examination in
September 2019, Dr. Bichai noted no spinal tenderness and continued good range of motion.  (AR
550, 553, 555, 558, 560.)  At a visit in November 2019 with Dr. Bichai, Plaintiff reported dizziness
and an incident where she fell in the restroom while fixing a shower curtain.  (AR 549.)  Plaintiff
made no complaints of musculoskeletal pain.  (AR 549.)  Dr. Bichai suspected that the fall was
related to the side effects of medication, as Plaintiff was taking multiple medications that could
cause drowsiness, and advised Plaintiff to be cautious as to those medications.  (AR 550.)

### 2.     Opinion Evidence

In November 2016, Dr. Jeanne Card, Psy.D., conducted a mental evaluation of Plaintiff.
(AR 341–45.)  Plaintiff stated she had experienced anxiety for eight years on and off and had a
previous diagnosis of unspecified anxiety disorder.  (AR 341.)  When asked to describe her anxiety,
she stated, "'I can't be around a lot of people.'"  (AR 342.)  At the time, Plaintiff reported taking
medication, but she was not under the care of a psychiatrist or therapist.  (*Id*.)

Dr. Card found that Plaintiff's symptom severity appeared to be in the mild range, and her
limitations appeared to be due primarily to her reported medical problems.  (AR 344–45.)  Dr. Card
noted that if Plaintiff's medical symptoms increased, her mental health symptoms may also
increase.  (AR 345.)  Dr. Card determined that Plaintiff was cognitively intact, capable of managing

her own funds, and able to perform simple and repetitive tasks on a regular basis.  (*Id*.)  Dr. Card further found that Plaintiff's ability to work with coworkers, supervisors, and the public, as well as to perform work activities on a consistent basis without special or additional instruction, was mildly impaired.  (*Id*.)

In November 2018, Dr. Bichai provided medical opinions regarding Plaintiff's mental capacity (AR 484–86) and physical health (AR 488–89).  Dr. Bichai's physical assessment noted previous diagnoses of cervical radiculopathy, fibromyalgia, and arthritis.  (AR 488.)  Dr. Bichai identified drowsiness and dizziness as side effects of medications that would impact Plaintiff's capacity for work, and responded "Yes" to a question as to whether Plaintiff would need to recline or lie down during a hypothetical eight-hour workday in excess of typical breaks.  (*Id*.)  Dr. Bichai also noted that Plaintiff's symptoms associated with impairments were not severe enough to interfere with the attention and concentration required to perform simple work-related tasks.  (*Id*.)

When asked to estimate Plaintiff's functional limitations in a competitive work environment on a sustained basis as a result of her impairments, Dr. Bichai stated: Plaintiff could walk only two city blocks without rest or significant pain; she was unable to sit, stand, or walk, and would have to take unscheduled breaks every hour for about ten minutes during an eight-hour workday; she could only lift less than ten pounds occasionally, meaning less than one third of the eight-hour workday; and she had limitations in doing repetitive reaching, handling, or fingering.  (AR 488.)  Lastly, Dr. Bichai opined that, based on experience with Plaintiff and objective medical, clinical, and laboratory findings, Plaintiff was likely to be absent from work as a result of her impairments or treatments more than four times a month.  (AR 489.)

Dr. Bichai's mental capacity assessment indicated Plaintiff's degree of limitation was extreme in the following areas: understanding, remembering, or applying information (such as the ability to sequence multi-step activities and use reason and judgment to make work-related decisions); concentration, persistence, or maintaining pace (such as the ability to ignore distractions while working, sustain an ordinary routine, and maintain regular attendance at work); adapting or managing oneself (such as the ability to adapt to changes, set realistic goals, and maintain personal hygiene and attire appropriate to a work setting); and interacting with others (such as the ability to

1   handle conflicts with others, respond to requests, criticism, and challenges, and keep social
2   interactions free of excessive irritability, sensitivity, argumentativeness, and suspiciousness).  (AR
3   484–86.)  Dr. Bichai provided no diagnoses or medical or clinical findings to support these
4   assessments.  (AR 484–86.)

5       **B.       Administrative Proceedings**

6       The Commissioner denied Plaintiff's applications for benefits initially on August 16,
7   2018, and again on reconsideration on November 19, 2018.  (AR 15, 77–78, 94–96, 111.)
8   Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR
9   15, 116–18.)

10      On June 25, 2020, Plaintiff appeared telephonically with counsel and testified before an
11  ALJ as to her alleged disabling conditions.  (AR 15, 34, 37–58.)  A vocational expert ("VE") also
12  testified at the hearing.  (AR 56–63.)

13      **1.       Plaintiff's Testimony**

14      At the hearing on June 25, 2020, Plaintiff testified that she had not worked since 2015 and
15  her husband was disabled.  (AR 38.)  Plaintiff stated three of their grandchildren lived with them
16  and four other grandchildren visited weekly.  (AR 38, 40–41.)  Over the last few years, Plaintiff
17  would take the grandchildren who lived with them to the movies once a week or to the park every
18  other week.  (AR 41–43.)  Plaintiff watches television for about two to three hours a day.  (AR
19  43.)  In terms of exercise, Plaintiff stated she does some home physical therapy stretches, and she
20  "already tried other therapy and it doesn't work."  (AR 44.)

21      Plaintiff testified that from 2005 to 2010, she worked for the Twin Cities Community
22  Hospital doing administrative work such as typing, answering telephones, registering patients,
23  scheduling procedures, and collecting money for the hospital.  (AR 46.)  Plaintiff did not work
24  again until 2015, when she worked part-time at Dollar Tree, and then switched to working as a
25  caregiver for the grandchildren, which she did for about a year.  (AR 46–47; *see also* AR 57–58.)
26  Plaintiff stated her husband does not need physical assistance from her and he is not working.
27  (AR 48.)  Plaintiff typically takes the two younger grandchildren to school in the morning, and
28  either she or her husband picks them up.  (AR 48.)  Plaintiff does the laundry for the family with

help from the grandchildren.  (AR 48–49.)  Starting in 2020, the grandchildren pitched in doing chores such as cleaning the house and the yardwork, but Plaintiff does the grocery shopping.  (AR 49–50.)  Plaintiff's husband helps with the cooking, and everyone in the family takes turns washing the dishes.  (AR 50.)

Plaintiff stated her neck pain was worse than the back pain.  (AR 51.)  She estimated that on an average day, her pain level was at a seven out of ten, and the neck pain shot or radiated down her right arm, causing numbness or tingling in her thumb and two middle fingers.  (AR 51–52.)  Plaintiff stated her back pain was at a nine out of ten level of pain, and it also shot or radiated down her legs.  (AR 52.)  She testified that the pain used to shoot only down the right leg to the bottom of her heel, but now it affects the left foot as well.  (AR 52.)  Plaintiff described how she participated in a nerve conduction study in January of 2020, and was told that she had a pinched nerve in her lower back.  (AR 52.)  As a result of that study, the plan was to treat Plaintiff's back with medication and give her two injections soon after the date of the hearing.  (AR 52–53.)  Plaintiff also stated she last received a neck injection in 2016.  (AR 53.)

Plaintiff described experiencing bad headaches every morning upon waking up, which would typically last until noon.  (AR 53.)  Plaintiff also stated she has vertigo and gets very dizzy every morning when she wakes up, but the vertigo "mellows out throughout the day."  (AR 53.)  Plaintiff testified that she cannot stand or be on her feet for longer than 15 minutes, and for an eight-hour period, the most she could stand was about an hour.  (AR 54.)  She stated she was unable to be on her feet as much as she was for the job she previously held.  (AR 54.)  As far as sitting, Plaintiff testified that the longest she could sit in a chair comfortably before she would have to get up and move around was ten minutes during an eight-hour period, and she would only be able to sit for no more than an hour.  (AR 54–55.)  Plaintiff also stated that the most she could lift and carry across the room was five pounds.  (AR 55.)

Plaintiff testified that her right hands and fingers were more painful than the left side.  (AR 55.)  She stated she could not open a door handle with her right hand or unscrew a water bottle, and although she is right-handed, she could attempt to do these tasks with the left hand.  (AR 55–56.)  Lastly, Plaintiff stated back in 2015, she used to have hobbies such as swimming, playing

volleyball, and bowling, and she can no longer participate in these hobbies now.  (AR 56.)

**2.    VE's Testimony**

At the hearing on June 25, 2020, the VE classified Plaintiff's past work experience at the Twin Cities Community Hospital as a patient scheduler, Dictionary of Occupational Titles ("DOT") 205.362-018, specific vocational preparation (SVP)[4] level of 4.  (AR 58–59.)  To obtain an SVP level of 4, the VE testified that a person would need to undergo education and training for about three to six months.  (AR 59.)

In the first hypothetical, the ALJ asked the VE to assume an individual had the following qualities: the same age, education, and past work experience as Plaintiff; could only lift or carry up to ten pounds frequently and 20 pounds occasionally; could stand or walk with normal breaks for a total of six hours in an eight-hour workday; could sit with normal breaks for a total of six hours in an eight-hour workday; could perform pushing and pulling motions with upper and lower extremities within the weight restrictions given; should avoid unprotected heights, moving machinery, and vibrations; could perform postural activities frequently, including climbing ramps or stairs, balancing, stooping, crouching, kneeling, and crawling; should not climb any ladders, ropes, or scaffolds on the job; and overhead reaching bilaterally would be limited to only occasionally.  (AR 59–60.)  The ALJ asked the VE whether such an individual could return to past work.  (AR 60.)  The VE responded that based on those parameters, the patient scheduler position would "survive" and remain available, both as described in the DOT and as actually performed.  (AR 61.)

In a second hypothetical, the ALJ asked the VE to assume an individual had the same restrictions as in the first hypothetical, but was further restricted as follows: could only lift or carry less than ten pounds frequently, and up to ten pounds occasionally; and could stand or walk with normal breaks for a total of only two hours in an eight-hour workday.  (AR 60.)  The ALJ again asked whether such an individual could return to past work.  (AR 61.)  The VE responded

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

1   that the past work of patient scheduler would survive as described in the DOT, though the VE

2   was unsure whether it would remain available as actually performed based on Plaintiff's

3   testimony regarding her past work.  (AR 61.)

4        In a third hypothetical, the ALJ asked the VE to assume an individual had the same

5   restrictions as in the second hypothetical, but this individual was further restricted as follows:

6   would be unable to consistently fulfill work for eight hours a day, for five days a week, in order

7   to complete a 40-hour week; and would miss at least three days in a work month on an

8   unscheduled basis.  (AR 61.)  The ALJ asked whether such an individual could return to past

9   work.  (AR 61.)  The VE responded no.  (AR 61.)

10       The VE confirmed that the testimony was consistent with the occupational descriptions

11  and characteristics as provided in the DOT.  (AR 61–62.)  The VE also acknowledged that the

12  past work of patient scheduler would not remain available if the dominant right upper extremity

13  was limited to occasional fingering, gripping, grasping, and reaching.  (AR 62.)

14  **C.      The ALJ's Decision**

15       In a decision dated July 10, 2020, the ALJ found that Plaintiff was not disabled, as defined

16  by the Act.  (AR 15–25.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R.

17  §§ 404.1520, 416.920.  (*Id.*)  The ALJ determined Plaintiff had not engaged in substantial gainful

18  activity since April 17, 2018, the application date (step one).  (AR 17.)  At step two, the ALJ found

19  Plaintiff's following impairments to be severe: degenerative disc disease of the cervical, thoracic,

20  and lumbar spine with cervical radiculopathy, lumbar scoliosis, right lower extremity peroneal

21  neuropathy, undifferentiated connective tissue disease, Sjogren's syndrome, and fibromyalgia.

22  (*Id.*)  The ALJ found Plaintiff did not have an impairment or combination of impairments that met

23  or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1

24  ("the Listings") (step three).  (AR 19.)

25       The ALJ next assessed Plaintiff's residual functional capacity ("RFC") and applied the

26  assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three

27  to step four, we assess your [RFC] . . . . We use this [RFC] assessment at both step four and step

28  five when we evaluate your claim at these steps.").  The ALJ determined Plaintiff had the RFC:

to perform light work as defined in 20 [§] CFR 416.967(b) except up to 10 pounds frequently and 20 pounds occasionally. She can stand and walk with normal breaks for a total of six hours in an eight-hour workday. She can sit with normal breaks for a total of six hours in an eight-hour workday. She can perform pushing and pulling motions with upper and lower extremities within the weight restrictions given. She should avoid unprotected heights, moving machinery and vibration. She can perform postural activities frequently, this includes climbing of ramps and stairs, balancing, stooping, crouching, kneeling and crawling. She should not climb any ladders, ropes or scaffolds on the job. She can only reach overhead bilaterally on an occasional basis.

(AR 19–20.)[5]  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause some symptoms[,]" the ALJ found Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms" to be "not entirely consistent with the medical evidence and other evidence in the record." (AR 21.)  The ALJ reasoned as follows:

In sum, [Plaintiff] alleged multiple physical and mental symptoms; however, Social Security Regulations provide that an individual's subjective complaints shall not alone be conclusive evidence of disability. Instead, there must be medical signs and findings established by medically acceptable diagnostic techniques. These signs and findings must show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities that could reasonably be expected to produce the pain or other symptoms alleged and would lead to a conclusion that the claimant is under a disability. The medical evidence in this case revealed [Plaintiff] has the above-mentioned impairments, which cause some limitations. Thus, the undersigned reduced the [RFC] to accommodate limitations resulting from these conditions. However, the undersigned did not find [Plaintiff's] allegations that she is incapable of all work activity due to the alleged limitations to be consistent with the other evidence of record in light of the reasons outlined herein.

(AR 24–25.)

The ALJ found that Plaintiff is capable of performing past relevant work as a patient scheduler, and this work does not require the performance of work-related activities precluded by the RFC (step four). (AR 25.)  The ALJ concluded that Plaintiff was not disabled since April 17, 2018, the date the application was filed. (*Id.*)

Plaintiff sought review of this decision before the Appeals Council, which denied review on February 1, 2021. (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

---

[5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Although the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *Id.*

### III.        LEGAL STANDARD

**A.        Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the [Act]." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [his or her] past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [his or her] past work, the

burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097.  "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "'Substantial evidence is more than a mere scintilla but less than a preponderance.'"  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ."  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "'[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation.'"  *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020); *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  The Court must instead determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts may not reverse an ALJ's decision on account of an error that is harmless.

1    *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017). Harmless error "exists when it is clear

2    from the record that the ALJ's error was inconsequential to the ultimate nondisability

3    determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation

4    marks omitted). "[T]he burden of showing that an error is harmful normally falls upon the party

5    attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

6                              **IV.      DISCUSSION**

7            Plaintiff contends the ALJ harmfully erred by improperly discounting the medical opinion

8    of treating physician Dr. Bichai (Doc. 13 at 15–21) and failing to incorporate the ALJ's own mental

9    limitation findings into the RFC without any explanation (Doc. 13 at 21–24). The Court disagrees

10   with Plaintiff's allegations of error and shall affirm the ALJ's decision.

11   **A.      The ALJ's RFC Determination is Supported by Substantial Evidence**

12          **1.      Legal Standard**

13          The nature of the ALJ's responsibility is to interpret the evidence in the record, including

14   medical evidence. *See, e.g., Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Such a

15   responsibility does not result in the ALJ committing legal error when the ALJ assesses an RFC that

16   is consistent with the record. *See Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL

17   4195012, at *4 (E.D. Cal. Aug. 22, 2014).

18          An RFC "is the most [one] can still do despite [one's] limitations" and it is assessed "based

19   on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of

20   evidence. 20 C.F.R. § 416.945(a)(1). "It is clear that it is the responsibility of the ALJ, not the

21   claimant's physician, to determine [RFC]." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir.

22   2001). Further, an ALJ's RFC determination need not precisely reflect any particular medical

23   provider's assessment. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1223 (9th Cir.

24   2010) (the ALJ properly incorporated physician's observations in the RFC determination while, at

25   the same time, rejecting the implication that the plaintiff was unable to "perform simple, repetitive

26   tasks in an environment without public contact or background activity").

27   ///

28   ///

**2.      The ALJ Properly Evaluated the Opinion of Dr. Bichai**

a.      Medical Opinion Evidence Generally

Plaintiff's claims for benefits are governed by the agency's "new" regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017.  20 C.F.R. §§ 404.1520c, 416.920c.  The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, ALJs must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions."  20 C.F.R. §§ 404.1520c(a)–(b), 416.920c(a)–(b).

Recently, the Ninth Circuit issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant.  *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources.").  Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, *see Murray*, 722 F.2d at 501–02, is likewise incompatible with the revised regulations.  Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).  Accordingly, under the new regulations, "an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."  *Id*. at 787.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [it] considered the supportability and consistency factors' in reaching these findings."  *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)); *see also id*. § 416.920c(b).  "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'"  *Woods*, 32 F.4th at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1));

1 | *see also id.* § 416.920c(c)(1).  "Consistency means the extent to which a medical opinion is

2 | 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'"

3 | *Woods*, 32 F.4th at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)); *see also id.* § 416.920c(c)(2).

4 | As the Ninth Circuit also observed,

5 | The revised regulations recognize that a medical source's relationship with the
claimant is still relevant when assessing the persuasiveness of the source's opinion.

6 | *See id.* § 404.1520c(c)(3).  Thus, an ALJ can still consider the length and purpose
of the treatment relationship, the frequency of examinations, the kinds and extent of

7 | examinations that the medical source has performed or ordered from specialists, and
whether the medical source has examined the claimant or merely reviewed the

8 | claimant's records.  *Id.* § 404.1520c(c)(3)(i)–(v).  However, the ALJ no longer needs

9 | to make specific findings regarding these relationship factors[.]

10 | *Woods*, 32 F.4th at 792.  "A discussion of relationship factors may be appropriate when 'two or

11 | more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent

12 | with the record . . . but are not exactly the same.'"  *Id.*; *see also* 20 C.F.R. § 416.920c(b)(3).  "In

13 | that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'"

14 | *Woods*, 32 F.4th at 792.  Finally, if the medical opinion includes evidence on an issue reserved to

15 | the Commissioner, the ALJ need not provide an analysis of the evidence in his decision, even in

16 | the discussions required by 20 C.F.R. §§ 404.1520c, 416.920c.  *See* 20 C.F.R. § 404.1520b(c)(3).

17 | With these principles in mind, the Court reviews the weight given to Dr. Bichai's opinion.

18 | b. <u>Analysis</u>

19 | In weighing Dr. Bichai's opinion related to Plaintiff's physical and mental functioning, the

20 | ALJ reasoned as follows:

21 | There is a more limiting opinion from [Plaintiff's] provider William Bichai, M.D.,
completed in November 2018, indicating that due to cervical radiculopathy,

22 | fibromyalgia, and arthritis, [Plaintiff] is unable to sit, stand or walk for any
significant period during a day (9F).  She can only walk two blocks without pain

23 | and will need to take unscheduled breaks every hour.  She can only lift less than 10
pounds.  She would miss work more than 4 days a month (9F).  Dr. Bichai also

24 | submitted an opinion on [Plaintiff's] mental impairments indicating that she has
extreme limitation in understanding, remembering, or applying information,

25 | extreme limitation in concentration, persistent, and pace, up to extreme limitation in
adapting and managing oneself, and mild to moderate limitation in interacting with

26 | others as of November 2018 (8F/4).  Neither of these opinions are persuasive.  In
terms of her physical limitations, [Plaintiff] certainly has abnormal findings on

27 | imaging and EMG.  She has had abnormal clinical findings.  But she has retained a

28 | normal gait and posture.  She has had only minor weakness.  She has had some

sensory perception loss but has been managed with medication.  She engages in a wide array of activities daily.  Her activities do not suggest that she cannot sit, stand, or walk for any significant period; nor do they suggest she can only walk two blocks.  In fact, [Plaintiff] testified that she drives her grandkids back and forth to school daily, which requires some sitting.  She sits and watches television each day.  She is able to do chores and helps with things around the house.  She can grocery shop.  All of this suggests she is not as limited as found by Dr. Bichai . . . Thus, there is little to support the moderate to extreme limitations noted by Dr. Bichai.  In light of all this, these opinions are not supported by or consistent with the evidence and are not persuasive.

(AR 24.)

The Court finds that the ALJ properly evaluated the supportability and consistency of Dr. Bichai's opinion.  First, the ALJ invoked the supportability factor by citing other relevant objective medical evidence in the record in determining that there was little to support the moderate to extreme limitations suggested by Dr. Bichai.  (AR 24.)  As noted above and described by the ALJ, Dr. Bichai opined that Plaintiff was restricted as follows: Plaintiff could walk only two city blocks without rest or significant pain; she was unable to sit, stand, or walk; she would have to take unscheduled breaks every hour for about ten minutes during an eight-hour workday; she could only lift less than ten pounds occasionally; she was limited in repetitive reaching, handling, or fingering; and she was likely to be absent from work more than four times a month.  (AR 24; *see also* AR 488.)  The ALJ acknowledged that Plaintiff had abnormal clinical findings, including those shown by imaging.  (AR 24; *see also* AR 368, 470, 506, 514.)  The ALJ, however, accurately highlighted that despite these abnormal findings, Plaintiff retained normal gait and posture, had only minor weakness, and had some sensory perception loss that was well managed with medication.  (AR 24; *see also* AR 444, 469, 507, 523–24, 538–39 (repeated instances where Plaintiff was found to have normal gait and/or posture, minimal weakness, and relatively intact sensation).)  And, pursuant to multiple physical examinations, treating providers found that Plaintiff had normal range of motion.  (*See* AR 444, 453–54, 507, 523–24, 538–39.)  Dr. Bichai himself noted no spinal tenderness and continued good range of motion based on examinations conducted after he provided the medical opinions at issue here in November 2018.  (*See* 550, 553, 555, 558, 560.)

Second, the ALJ invoked the consistency factor by citing Plaintiff's own testimony regarding her daily activities and concluding that Plaintiff was not as limited as suggested by Dr.

Bichai.  (AR 24.)  As cited by the ALJ and detailed above, Plaintiff testified that she typically took the two younger grandchildren to school in the morning, and either she or her husband would pick them up.  (AR 24; *see also* AR 48.)  Plaintiff also stated she does chores such as laundry and yardwork with help from the grandchildren, but Plaintiff herself does the grocery shopping.  (AR 24; *see also* AR 48–50.)  Lastly, Plaintiff testified that she watches television for about two to three hours throughout the day.  (AR 24; *see also* AR 43.)  Accordingly, the ALJ concluded that Plaintiff's activities do not suggest that she cannot sit, stand, or walk for any significant period of time, nor did they suggest she can only walk two blocks, as found by Dr. Bichai.  (AR 24.)

Based on the foregoing evidence, the ALJ's finding that Dr. Bichai's opinion was inconsistent with the longitudinal record as a whole is legally sufficient and supported by substantial evidence.  *See, e.g., Kniffen v. Kijakazi*, No. 1:21-cv-00703-SKO, 2023 WL 346794, at *8–9 (E.D. Cal. Jan. 20, 2023); *Deacon v. Kijakazi*, No. 1:21-cv-00641-BAM, 2022 WL 17363228, at *10–11 (E.D. Cal. Dec. 1, 2022); *Sutton v. Kijakazi*, No. 1:21-cv-01097-SKO, 2022 WL 4110304, at *9 (E.D. Cal. Sept. 7, 2022).  It was therefore reasonable for the ALJ to conclude that the record supported the conclusion that Plaintiff was not as limited as Dr. Bichai opined, and thus, Dr. Bichai's opinion was unpersuasive (AR 24).  *See Batson v. Comm'r Soc. Sec. Admin*., 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

### 3.   The ALJ's Formulation of Plaintiff's RFC Was Not Erroneous

Plaintiff further contends that the ALJ incorrectly failed to explain why the non-severe mental limitations identified by the ALJ herself were not included in Plaintiff's RFC.  (Doc. 13 at 22.)  Plaintiff acknowledges that the ALJ is not *required* to incorporate her own mental limitation findings into the RFC, but rather, the ALJ was obligated to *consider* the limitations, even if non-severe, in assessing Plaintiff's RFC.  (Doc. 13 at 23.)

An ALJ must consider the limiting effect of all impairments, including those that are non-severe, in assessing a claimant's RFC.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).  "However, an ALJ is not required to include limitations in the RFC if the record supports a conclusion that the

1   non-severe impairment does not cause a significant limitation in the claimant's ability to work."

2   *Kendall v. Saul*, No. 1:19-cv-01485-SKO, 2021 WL 736268, at *13 (E.D. Cal. Feb. 25, 2021).

3        Here, at step two, the ALJ found that Plaintiff's medically determinable mental impairments

4   of depression and anxiety did not cause more than mild limitations in her ability to perform basic

5   mental work activities.  (AR 17, 19.)  Therefore, in conformity with 20 C.F.R. §§ 404.1520a(d)(1),

6   416.920a(d)(1), the ALJ determined Plaintiff's mental impairments were non-severe.  (AR 17, 19.)

7   The record reflects that the ALJ considered all of the evidence related to Plaintiff's mental

8   impairments at step four before deciding that inclusion of limitations based on those impairments

9   in the RFC was not warranted.  At the hearing on June 25, 2020, Plaintiff was not asked whether

10  she had any mental impairments, and she did not state that she experienced any mental

11  impairments.  Furthermore, contrary to Plaintiff's assertions that the ALJ failed to consider her

12  mental limitations in formulating the RFC (*see* Doc. 13 at 22–23), the ALJ provided the following

13  reasoning in finding Dr. Bichai's opinion as to Plaintiff's mental impairments unpersuasive:

> In terms of her mental conditions, the claimant has only periodically complained of mental health issues and her mental status findings have routinely been intact with no overt deficits in memory, attention, or concentration.  She has simply been managed on an outpatient basis with medication.  She engages in the activities noted previously.

17  (AR 24.)  The ALJ cited similar evidence in finding Dr. Card's opinion to be persuasive.  (*Id*.)

18  While acknowledging that Dr. Card's opinion was provided before the alleged onset date, the ALJ

19  reasoned that Plaintiff's mental health "has not clearly worsened," and thus, Dr. Card's opinion

20  was "reasonably consistent with the evidence."  (*Id*.)

21       Despite Plaintiff's suggestions otherwise (Doc. 13 at 22–23), no further explanation was

22  required.  "So long as the ALJ 'actually reviews the record and specifies reasons supported by

23  substantial evidence for not including the non-severe impairment [in the RFC determination], the

24  ALJ has not committed legal error.'"  *Kendall*, 2021 WL 736268, at *13 (citing *McIntosh v.*

25  *Berryhill*, No. EDCV 17-1654-AGR, 2018 WL 3218105, at *4 (C.D. Cal. June 29, 2018) (because

26  the ALJ concluded that mental impairment was non-severe and caused no more than minimal

27  restrictions, there was no requirement to include it in the claimant's RFC)).  The ALJ thus did not

28  err in formulating Plaintiff's RFC.

**4.      Even Assuming *Arguendo* the ALJ Did Err, Such Error Was Harmless**

Even had the ALJ erred by failing to incorporate Plaintiff's non-severe mental impairments into the RFC, such error was, at most, harmless.  A claimant is prejudiced at step two by an ALJ's omission of an impairment only where that step is not resolved in the claimant's favor.  *See, e.g., Burch*, 400 F.3d at 682 ("Here, the ALJ did not find that Burch's obesity was a 'severe' impairment . . . . Assuming without deciding that this omission constituted legal error, it could only have prejudiced Burch in step three (listing impairment determination) or step five (RFC) because the other steps, including this one, were resolved in her favor."); *Hickman v. Comm'r Soc. Sec. Admin.*, 399 Fed. Appx. 300, 302 (9th Cir. 2010) ("Any error in the ALJ's failure to include a reading disorder as one of Hickman's severe impairments at step two of the analysis is harmless.  The ALJ found Hickman suffered from other severe impairments and, thus, step two was already resolved in Hickman's favor.").  Additionally, the failure to include an impairment in the step two analysis is harmless if the ALJ considers the functional limitations that flow from the impairment in subsequent steps.  *See Lewis*, 498 F.3d at 911 (holding that ALJ's failure to list plaintiff's bursitis as a severe impairment at step two was harmless where ALJ considered limitations caused by the condition at step four).

Here, at step two, the ALJ determined that Plaintiff's severe impairments included degenerative disc disease of the cervical, thoracic, and lumbar spine with cervical radiculopathy, lumbar scoliosis, right lower extremity peroneal neuropathy, undifferentiated connective tissue disease, Sjogren's syndrome, and fibromyalgia.  (AR 17.)  The ALJ then proceeded to the step three analysis.  (*See* AR 17–19.)  Therefore, Plaintiff was not prejudiced by any error in the step two analysis because her claims were not screened out at this step and thus, step two was resolved in her favor.  *See, e.g., Wilson v. Kijakazi*, No. 1:20-cv-01753-SKO, 2022 WL 3908428, at *12 (E.D. Cal. Aug. 30, 2022).

The ALJ also considered the functional limitations that flowed from the mild mental impairments in subsequent steps.  As noted above, when evaluating the persuasiveness of the opinions of Dr. Bichai and Dr. Card, the ALJ acknowledged that Plaintiff periodically complained of mental health issues.  (AR 24.)  The ALJ proceeded to explain, however, that Plaintiff's mental

status findings had been routinely intact with no overt deficits in memory, attention, or concentration, that Plaintiff's mental health symptoms had been managed effectively with medication, and Plaintiff was still able to engage in activities. (*Id*.)  In addition, the ALJ stated in RFC findings that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (AR 20).  *See, e.g., Sara Ann W. v. Comm'r of Soc. Sec*., No. 2:17-CV-00277-RHW, 2018 WL 4088771, at *4 (E.D. Wash. Aug. 27, 2018) ("the ALJ specifically noted that she considered *all symptoms* in assessing the [RFC] . . . Accordingly, the Court finds the ALJ did not err in the step two analysis, and if any error did occur it was harmless.") (original italics).

In sum, the Court concludes that the ALJ properly weighed the medical evidence and did not harmfully err in her assessment of Plaintiff's RFC.  Even if the ALJ did err, for the reasons described above, any error was harmless.  *See Kendall*, 2021 WL 736268, at *13–14; *see, e.g*., *Wilson*, 2022 WL 3908428, at *12.

## V.       CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 27, 2023**                          /s/ *Sheila K. Oberto*
                                               UNITED STATES MAGISTRATE JUDGE